MOOERS *against* WHITE and others.

An *alien* cannot take land by descent; and though an *alien* may take by purchase or devise, and hold until office found, yet, on his death, the land will *escheat* to the people, without any inquest of office.

Where land escheats by reason of the alienage of the devisee, that does not defeat the *lien* of creditors existing at the death of the devisor, but the land remains chargeable with his debts. And where the land, after the death of the devisor, was taken for the use of the government, and the damages, or value of the land assessed, was paid into this Court: *Held*, that the creditors of the devisor might follow the proceeds into this Court, whose jurisdiction over the application of the moneys was not affected by the title of the state, by escheat.

Where an agent had suffered thirty years, after his agency ceased, (though he had subsequent transactions with his principal,) and sixteen years, before the death of his principal, to elapse, without rendering an account, or filing a bill: *Held*, that the staleness of the account was a bar to its admission.

Any acknowledgment or admission, made by an executor, or administrator, will not bind the *real assets*, in the hands of an heir or devisee, or of the people, by escheat, or affect the right of either to plead the statute of limitations.

An executor or administrator cannot, at any time, apply to the Surrogate, under the statute, for a sale of the real estate, on the ground of a deficiency of personal estate, but must make such application within a reasonable time. One year after the executor has entered on the execution of his trust, is such reasonable time, unless, under the peculiar circumstances of the case, the Surrogate, in the exercise of a sound discretion, should think it consistent with the spirit and policy of the statute, to grant the application, after the lapse of a year.

And the heir or purchaser, or persons interested in the real estate, may appear before the Surrogate, and oppose the application of the executor, and interpose the statute of limitations.

*October 10th.* THE plaintiff filed his bill on the 16th of *December*, 1818, against *Moses White*, executor, and *Charlotte Hazen*, executrix, of *Moses Hazen*, deceased, and *Eddy Thurbur*,

alleging, that *Hazen,* at the time of his death, was indebted to him in above the sum of 5000 dollars, the balance of an unsettled account of dealings between them, from the 26th of *July,* 1783, to the time of *Hazen's* death. That a part of this account was for services rendered by the plaintiff, as agent and attorney in fact of *Hazen,* constituted by letters of attorney, dated *August* 29th, 1787. That *Hazen,* by his will, dated *September* 26th, 1781, appointed his son, *William H.,* and *Moses White,* one of the defendants, his executors; and, after devising various portions of this property, he devised the residue of his estate to his two executors, equally. Afterwards, on the 13th of *June,* 1793, he made a codicil to his will, and appointed his wife, *Charlotte Hazen,* one of the defendants, executrix, with the two executors named in the will, and gave her one third of the residue of his estate, and declared it to be his intention, that the residue should be equally divided between his executors and executrix. The testator died at *Troy,* *February* 4th, 1803, and the will and codicil were proved before the Surrogate of *Rensselaer* county, on the 8th of *January,* 1804; and letters testamentary were granted to the defendant, *Moses White,* who took upon himself the administration of the estate, and has been the active executor. *White* lived at *Lancaster,* in *New-Hampshire;* and *William H.,* the son of the testator, was an *alien,* residing in the *British* province of *Nova Scotia,* at the time of his father's death, and died many years ago, and prior to the 1st of *January,* 1808. The bill further stated, that the defendants, *White* and *Charlotte H.,* as executors of *H.,* were indebted to the plaintiff to the amount of 500 dollars, for services rendered, as agent and attorney in fact of the executors, or one of them, in settling the estate, &c. That the testator, at the time of his death, was seised in fee of lot No. 62, in the *Refugee Tract,* in *Clinton* county, which lot being required by the *United States* for fortifications, the usual proceedings were had by a writ of *ad*

1822.

MOOERS
v.
WHITE.

1822.

MOOERS
v.
WHITE.

*quod damnum*, issued *April* 25th, 1817 ; and the lot was appraised at two thousand five hundred dollars, besides the expenses, which sum was paid into this Court, and the lot conveyed to the *United States.* That the defendant, *E. Thurbur*, having claimed the money, by petition, filed in this Court, and *Charlotte H.*, also, having claimed it, by her petition, and the plaintiff having, also, filed his petition, claiming one twenty-seventh part of it, as one of the heirs of the testator, the Court ordered, that either of them might file their bill, setting forth their claim to the money ; but the plaintiff was not yet advised, whether he should pursue his claim for his proportion of the money, as one of the heirs of *H.* That the executors, and particularly *White*, had possessed themselves of the real and personal estate of *H.*, and the plaintiff had frequently applied to them for a settlement and payment of his demands, which they had neglected to do. That after deducting the dower of the defendant, *Charlotte H.*, from the amount of property, there did not remain sufficient to pay all the just debts of *H.*, and unless the money, so remaining in this Court, was appropriated for that purpose, the plaintiff would lose his debt. The plaintiff *prayed* for an account, and that the balance, which might be found due to him, might be paid out of the money in this Court, as far as it would go for that purpose ; and that the defendant, *Thurbur*, might be compelled to come into this Court, to establish his title to the lot, at the time of the assessment under the writ of *ad quod damnum*, or be for ever barred of his claim.

The bill was taken *pro confesso* against *Charlotte H.* and *E. Thurbur*, on the 8th of *November*, 1819.

The defendant, *White*, put in his answer on the 13th of *March*, 1820. He denied that the testator, at the time of his death, was indebted to the plaintiff. He admitted that the plaintiff, as agent and attorney of the testator, had performed services for him, as stated in the bill, but insisted, that on a fair settlement of the account, there would be a

balance due from the plaintiff. He alleged, that the testator had, in his lifetime, been very anxious to come to a settlement with the plaintiff, and had made many attempts for that purpose, which had failed, through the fault of the plaintiff. He denied that he had taken possession, or assumed the control of the real estate of *H.* He gave an account of the personal estate which had come to his hands; and of his payments and disbursements, &c. He admitted that the plaintiff, soon after the death of *H.,* claimed a large balance from his estate; but had never rendered any account, though he had been requested by the defendant, and had promised to exhibit it. The defendant insisted on the statute of limitations, in bar of the plaintiff's demand; and alleged, that the executors had not admitted or acknowledged the claim within six years; and he claimed the money deposited in Court, as assets, for the payment of debts owing by *H.*

The plaintiff replied to the answer of *White,* and filed a supplemental bill, making the *Attorney General* a party defendant, and stating the proceedings in the original suit, and the alienage of *William H.*, the son of the testator, &c. The Attorney General put in an answer, setting forth the will of *H.*, the alienage of his children, and the devise of the lot in question to *William H.*, an alien, and claiming that the people were entitled to the lot, by escheat, and to the money arising from the sale of it, &c. &c. He denied that the estate of *H.* was indebted to the plaintiff, and insisted, that if any thing was due to him, there were assets which had come to the hands of the executors sufficient to pay that, and all other debts; and that the plaintiff was barred by the statute of limitations.

Among the exhibits proved in the cause were various letters from *H.*, and the defendant, *W.*, to the plaintiff. In a letter dated *October* 2, 1805, from *W.* to the plaintiff, he says, " I wish we could meet and settle your old account." And again, *August* 4th, 1806, he expresses a hope

1822.

MOOERS
v.
WHITE.

to meet the plaintiff and settle the accounts between him and the testator in the course of the year. In a letter from the testator to *W.*, of *October* 26, 1796, he says, that the plaintiff appeared anxious for a final settlement of their matters, and is willing, if they should not agree, to leave the points to Judge *Tayler.* In a letter from the testator, to *W.*, dated the 24th of *May*, 1797, he complains that he cannot get the plaintiff to a settlement, and had instructed his attorney to arrest him for 20,000 dollars; that he had told the plaintiff the last winter, that he should revoke his power of attorney. On the 4th of *September*, 1808, *W.* writes to the plaintiff, that he wishes to come to an adjustment of the matters between the plaintiff and the testator. On the 12th of *December*, 1809, *W.*, in a letter to the plaintiff, says, he hopes the plaintiff will take care that any lands in this state, belonging to the estate of *H.*, are not sold for taxes, and offers to refund him for advances, and pay him for his trouble. In a letter from *W.*, to the plaintiff, dated *March* 20th, 1813, he states, that the testator was disabled by sickness, at *New-York*, in *April*, 1786, and rendered helpless by palsy; and he recognises the plaintiff as agent for the testator's land in *New-Hampshire*, &c. On the 27th of *August*, 1813, *W.*, in a letter to the plaintiff, says, he had called on him three times for a settlement, and could not effect it. That, at their last interview, it was agreed that the plaintiff should make out the account of debt and credit, as the testator kept no accounts during his agency. In a letter of the 10th of *December*, 1816, to the plaintiff, *W.* complains of the enormous delays of the plaintiff, by postponing a settlement in the lifetime of the testator, and since; and repels the charge of the plaintiff, that he, *W.*, has thrown obstacles in the way of a settlement.

*Foote*, for the plaintiff, cited 1 *Johns. Ch. Rep.* 46. 620. 1 *Maddock's Ch.* 79. 2 *Johns. Rep.* 200. 15 *Johns. Rep.* 3.

*E. Howe,* for the executors of *Hazen.*

Talcot, (*Attorney General,*) for the state. He cited 2 *Ves.* 400. 10 *Ves.* 93. 2 *Vern.* 694. 1 *P. Wms.* 742. 6 *Ves.* 580. *Pothier on Obl.* 665. ch. 8. s. 5. 6 *Johns. Rep.* 59. 1 *Chitty's Pl.* 40.

1822.

MOOERS
v.
WHITE.

THE CHANCELLOR. The chief object of the bill is, to have the claim of the plaintiff, against the estate of *Moses Hazen,* liquidated and allowed, and paid out of the moneys in Court, being the proceeds of lot No. 62, in the *Refugee Tract,* in *Clinton* county. The bill admits, that without the aid of those moneys, the plaintiff is apprehensive he shall wholly lose his debt; and the prayer of the bill is, that his account may be settled and paid by the executor, or satisfied out of the moneys in Court. The answer of the defendant, *White,* as sole acting executor, states, that there are no assets unadministered, unless it be those moneys; and there is nothing in the testimony to contradict that averment.

Assuming, then, for the present, that the suit is by a creditor of *M. H.,* for the proceeds of lot No. 62, the first inquiry is, whether the defence, set up by the Attorney General, on behalf of the people of this state, be a good defence, in reference to that fund.

The testator devised the lot No. 62, to his brother, *William Hazen,* in fee ; and it is an admitted fact, that the testator died in 1803, seised of that lot, and that the devisee was then an alien, and continued an alien to his death, which was prior to 1808. The people of the state became seised of the lot upon the death of *W. H.,* without any inquest of office, and this appears to be very clear and unquestionable. In the first place, the children of *W. H.* were aliens also, and could not take by descent. The law, *quæ nihil frustra,* never casts the freehold upon an alien heir, who cannot keep it ; and, as the freehold cannot be kept in abeyance for a moment, it vested immediately in the

An alien cannot take land by descent.

1822.

MOOERS
v.
WHITE.

Though an alien may take by purchase, and hold until office found, yet, on his death, the land *escheats*, without any inquest of office.

people by escheat. This rule is well settled in the common law, and it was admitted by the Supreme Court, in *Jackson* v. *Lunn*, (3 *Johns. Cases*, 109.) But if the children of *W. H.* had not been aliens, it would not have altered the case. They could not have taken, by descent, from their father, for no one can take, by representation, from an alien. Though an alien can take by purchase or devise, which is taking by act of the parties, as contradistinguished from taking by operation of law, and can hold until office found, yet the law will not enable him to transmit by hereditary descent. No one can take by inheritance, when he must deduce his title through an alien who has no inheritable blood, and, upon the death of the alien, the land instantly, and of necessity, without any inquest of office, escheats to the people. (*Collingwood* v. *Pace*, 1 *Sid.* 193. 1 *Vent.* 413. *Co. Litt.* 2 b. *Plowd.* 229 b. 230 a.)

The title to the lot was, therefore, in the state, from the death of *W. H.;* and the next question is, whether the proceeds of the lot sold to the *United States*, under the authority of this state, are liable to be appropriated to the payment of the creditors of *Moses Hazen*.

When the lot was sold to the *United States*, and the proceeds paid into this Court, to be distributed among the persons entitled to receive them, the officers of the government were, no doubt, ignorant, equally with all the parties concerned, that the lot had escheated. The title was presumed to reside in the representatives of *M. H.*, the testator, though that title had never been investigated. The history of the case is shortly this, as appears from the records of the Court. The *United States*, after the last war, required this and some adjoining lots, lying at *Rouse's Point*, at the north end of *Lake Champlain*, to erect thereon fortifications for the defence of the lake. The consent of the government of this state was duly declared, and a writ *ad quod damnum* issued out of this Court to assess the damages of the owners of the lots so appropriated. The da-

mages were accordingly assessed, by a jury of *Clinton* county, and paid by the *United States*, and the lands adjudged to be vested in the people of this state, and ceded by them to the *United States.* The moneys were, in the first instance, paid to the Governor, and, by his direction, deposited in this Court, and notice was accordingly given, by order of the Court, for the owners of the lands to exhibit their claims and titles. The extravagance of the assessments, gave life and vigour, at once, to every species of claim. The value of the lot, now in question, had been assessed at 2500 dollars. The defendant, *Thurber*, had been in possession for some years, without title, and he advanced a claim, under some alleged agreement, made as early as 1807, with the present plaintiff, as agent for *White*, the executor. The widow of the testator, also, put forward a claim of title, without any colour for it, but she has since received a sum in gross out of the proceeds, for her dower. The plaintiff claimed a small undivided part of the lot, as a collateral heir to *Moses Hazen*, and the defendant, *White*, the executor, presented a petition for a portion of the proceeds, to supply the deficiency of personal assets to pay a debt assumed to be due to the estate of one *John White*, in *April*, 1793, for 371 dollars 82 cents, and which, with interest to the time of the petition, (being 25 years,) was made, by him, to amount to 1126 dollars 42 cents. All these pretexts as to title, were evidently without any foundation, and the right of the state, as owner of the lot, to the moneys deposited, would seem to be undoubted, subject only to the just claims (if any there be) of the creditors of *Hazen*.

The admission of the title of the state does not affect the jurisdiction of the Court over the moneys in its possession, as assets, for the payment of debts. The land, upon the death of *Hazen*, the testator, was chargeable with his debts, in the hands of his heir or devisee, and the escheat of the title, by means of the alienage of the devisee, would

1822.

MOOERS
v.
WHITE.

Where land escheats, by reason of the alienage of the devisee, the lien of a creditor of the devisor is not defeated; and he may follow the proceeds of the land into this Court.

not, of itself, and without reference to the lapse of time, or other extrinsic circumstances, defeat the lien of the creditors, existing at the death of *Hazen.* The land would, in a proper case, continue chargeable, even after it had become vested in the state, on the death of the devisee, or upon inquest of office, found in his lifetime. So, I also apprehend, the lien of the creditor would follow the proceeds, and, in the view of a Court of equity, attach upon them in the possession and under the direction of this Court. I speak now, generally, in respect to valid and subsisting debts, and not with any reference to the merits of the present demand, and which I shall hereafter examine. The powers of the Court, in an analogous case, are fully explained in the provisions of the " act concerning escheats." (*R. L.* Vol. 1. 379.) It is there declared, that in certain cases, *if no person shall appear within one year, to claim the personal estate of the intestate, the administrator is to pay the proceeds, after deducting the debts, into the state treasury; and if any person shall, thereafter, claim any part of the money, he is to present a petition to the Chancellor, and a copy is to be served upon the Attorney General, who is to put in an answer to the same; and the Chancellor is then to examine the claim, and the allegations and proofs; and if he shall find such person entitled to any money so paid in, he shall direct the Comptroller to issue his warrant upon the Treasurer to pay it.* The jurisdiction of the Court over the application of the fund to the payment of debts, is not questioned in this case by the Attorney General, for he has answered the bill, and puts his defence upon the ground, that there is nothing due to the plaintiff; and that if the testator, in his lifetime, did owe him any thing upon the unsettled account, he is now barred by lapse of time, and especially by the statute of limitations, from setting up any demand against the fund.

The case is then reduced to this point, whether the defence set up on the part of the people, as owners of the

fund, be sufficient to bar all further inquiry into the state of the accounts between the plaintiff and the testator in his lifetime, and to conclude the plaintiff, as to any balance which he might claim ; and

(1.) As to the staleness of the demand.

A Court of equity will not permit accounts to be over-haled in favour of a party who has slept upon his rights, without any just cause, for a great number of years; and more especially as against the representatives of a party who may be supposed to have had the means of defence in his lifetime, but who may have left his successors without the requisite vouchers. In *Bridges* v. *Mitchell*, (*Bunb.* 217.) the Court of Exchequer would not decree an account for one partner against another, for the balance of an account of twenty-four years standing before the filing of the bill, though the parties had been partners as merchants, and were both alive. After such a length of time without suit, the Court observed, that the balance should be presumed to be satisfied, and they allowed the plea, which relied equally on the length of time and the statute of limitations. In the more modern case of *Hercy* v. *Dinwoody*, (4 *Bro.* 257.) the plaintiff, as a creditor, had lain by a great length of time, and suffered an estate to be distributed ; and the Master of the Rolls, for that cause, would not suffer an account to be taken, but dismissed the bill. The same rule was recently declared in the *English* Chancery, in *Chalmer* v. *Bradley*, (1 *Jacob & Walker*, 62, 63, 64.) and length of time was considered as forming a presumption of right, and a bar to the allowance of an account. The case of *Ray* v. *Bogart*, (2 *Johns. Cases*, 432.) decided in Chancery, and afterwards in the Court of Errors of this state, on appeal in 1800, is a very strong instance of the exercise of the discretion of the Court, in refusing to sustain a bill for the settlement even of a co-partnership account, when the demand had become stale by the lapse of time and the death of parties. The whole.

*Length of time will form a presumptive bar to the admission of an account.*

MOOERS
v.
WHITE.

time in that case was but thirty years, and that included the period of the *American* war, when the course of justice was for a while suspended, and there were many other circumstances in the case to constitute a reasonable excuse for delay, yet both the Court of Chancery and the Court of Appeals considered the account too old and stale to be submitted to an inquiry. And what are the facts in the present case?

The bill charges that *Moses Hazen* died indebted to the plaintiff for the balance of an unsettled account, arising from services as agent, between the 26th of *July*, 1783, and the 29th of *August*, 1787, and from various other dealings and transactions between the period first mentioned and the testator's death, which happened on the 4th of *February*, 1803. The agency account, from the plaintiff's own showing, terminated upwards of thirty-one years before the filing of the bill, and upwards of sixteen before the testator's death. Is not that most palpably a stale account? The account relating to other dealings must have been of several years standing before the testator's death, as I shall presently show; and, therefore, on the face of the bill, a strong objection presents itself from the lapse of time; and this objection is very materially strengthened by a perusal of the letters, which are made exhibits in the cause.

*The staleness of an account, is a bar to its admission.*

It is to be noticed, in the first place, as a fact appearing in the case, that the testator was rendered quite helpless, by a stroke of the palsy, as early as *April*, 1786; and it is assumed as another, and a well known fact, that he remained bedridden, from that period to his death. The dealings with a man labouring under such severe infirmity, require, in a special degree, to be controlled by the check which the Courts have provided against error and mistake in dormant transactions, for such an unfortunate individual is not to be supposed to have been able to give a continued and sharp-sighted attention to his affairs.

In confirmation of the truth of this remark, we find it stated in a letter from *White*, the executor, to the plaintiff, written in 1813, that, " at the last interview, it was agreed between us, that you should make out a statement of your account, debt and credit, and transmit the same to me for examination, with such documents as I could find among General *Hazen's* papers. He having kept no accounts during your agency, it remains altogether with you to make out such a statement as justice and good conscience will approve." To open a stale account, under these peculiar circumstances, would seem to be contrary to sound discretion, for it would be placing the estate of *Hazen* under the control and at the mercy of the plaintiff.

The testator appears to have made repeated efforts in his lifetime, and without success, to bring the plaintiff to an account. By his letter to the plaintiff of the date of the 12th of *October*, 1792, he complains that the plaintiff had not accounted to him for some business which he had undertaken to do for him as early as 1790, and that he had a full power of attorney from him (the testator) to act for him, and *Hazen* appeared to be dissatisfied, and thought it was time for the power to cease. " It was high time," he said, " that the plaintiff and he should come to a settlement of accounts, and he requested the plaintiff to forward what he had against him as soon after the receipt of the letter as he could." In a subsequent letter, from *Hazen* to the defendant, *White*, dated *August* 26th, 1796, he says, the plaintiff " appeared to be anxious for a settlement of their matters, and had agreed to be at *Troy* in *January* following." It seems that the testator resided at *Troy* during the latter years of his life, and as he was immoveable himself, the plaintiff, if he would meet him at all, must meet him at *Troy*. The testator, in a letter to *White*, of the 24th of *May*, 1797, complains that the plaintiff had disappointed him, and that he could not get him to a settlement. " The prospect," he states, " which he had of a compromise with the

plaintiff rather vanished, and that the plaintiff had fixed the 10th of that month (then past) to be there. That he had come to a resolution to prosecute the plaintiff, and had given his attorney directions to commence a suit against him for no less a sum than 20,000 dollars."

It may now be properly asked, why did not the plaintiff meet *Hazen*, according to his repeated solicitations, and come to a settlement with him? We have proof that he was earnestly pressed in 1792, and again in 1797. He waits until the death of *Hazen*, in 1803, without making one single effectual effort to meet him in his lifetime, and settle the account. This is the conclusion to be drawn from what appears in the case. It is not until *December*, 1818, or nearly sixteen years after the death of *Hazen*, that he filed his bill for a settlement of his accounts, after the executor had admitted that the testator kept no vouchers, and that he must be beholden to the plaintiff for the credit as well as the debit side of the account. It appears to me that it would be hazardous in this case, and dangerous as a precedent, and contrary to the doctrines and policy of the Court, to undertake to investigate and settle an account of such long standing, reaching back to the year 1783, accompanied with so many grounds of complaint at the negligence of the party, and with so many peculiar circumstances of obscurity, difficulty, and danger.

The staleness of the account is then, of itself, a decisive objection to a bill calling upon the Court to open and admit it.

(2.) The statute of limitations appears also to constitute a valid defence, and to present an insuperable objection to the suit.

The six years had probably closed upon the last item in the account before the testator's death, and I see no room for doubt that the statute applies to the case. When the statute once begins to run, it continues to run without being impeded by any subsequent event.

Where the statute of limitations begins to run, it continues to run, without being impeded by any subsequent event.

But it is said, that the defendant, *White*, has, by his let-
ters of the 20th of *March*, and 27th of *August*, 1813, (and
which are within the last six years before suit brought,)
made sufficient acknowledgments, to take the case out of
the statute.   Assuming the acknowledgment to have been
made, he did it in his character of representative of the
personal assets, and the question then arises, will such an
admission bind the real assets in the hands of the heir or
devisee, or of the lord paramount by escheat?   It would
seem to be a principle of manifest justice, that an acknow-
ledgment by the executor ought not to bind the heir, for
he does not represent the heir, and has no direct control
over the real estate.   The executor, *virtute officii*, has no
concern with the real estate, and the will in this case did
not invest him with any such power.   The defendant de-
nies, in his answer, that he ever took possession of the real
estate, or assumed any control over it.   An executor or
administrator may, under certain circumstances, and in a
proper time, apply to the Surrogate or Court of Probates,
and obtain an order to sell the real estate to pay debts; but
his authority, in such a case, is derived entirely from the
order, and without it he has no manner of right to inter-
fere with the real assets in the hands of the heir or devisee.
In the present case, no such application was ever made or
order obtained; and the acknowledgment of the debt, by
the executor, can no more bind the heir, or the estate of
which he is seised by descent, than an acknowledgment
by the widow of an intestate, who is entitled to letters of
administration, but never obtains them, can bind the per-
sonal assets in whomsoever they may happen to be.   The
executor may, no doubt, charge the personal estate by
confession, but this is an act *inter alios*, as respects the
heir, who has his own assets, of which he is seised in his
own right, to defend and preserve.   The executor pos-
sesses the personal estate as trustee, and the heir the real
estate as owner; and is he to be charged, at the mere plea-

1822.

MOOERS
v.
WHITE.

Any acknow-
ledgment or
admission by
an executor or
administrator,
will not bind
the *real assets*
in the hands of
an heir or de-
visee, or of the
people, by es-
cheat, or af-
fect the right
of either of
them to plead
the statute of
limitations.

1822.

MOOERS
v.
WHITE.

sure of the executor, with the debts of his ancestor? Does it rest entirely in the discretion of the executor, whether the heir is or is not to be permitted to use the statute of limitations, which the law has provided as a means of defence against a simple contract demand, which, perhaps, he knows to be unjust, though his ancestor has not left him the requisite proof? I cannot bring my mind to assent to so unreasonable a proposition, nor to admit that the heir is not entitled, as against the creditor seeking to charge his estate, to use every lawful plea, unaffected by the act or admission of the executor.

If the real estate of *Hazen* was to be charged with the debt of the plaintiff, why should the charge fall exclusively on this portion of the estate, which was devised in fee to his brother, *William Hazen*, but which has been wrested, by the rigorous operation of law, from the possession of the children of that brother, and vested in the people of this state? Why should not the estate of the plaintiff, himself, bear, at least, a portion of that charge? It appears by the testator's will, annexed to the answer, that the executor and the plaintiff were equally partakers of his munificent bounty. This testator was the same Colonel, afterwards General *Hazen*, who commanded the 2d *Canadian* regiment during the *American* war; and the defendant, *White*, was a captain, and the plaintiff a lieutenant in that regiment; and when *H.* made his will, in 1781, he devised to "Captain *Moses White*, Lieutenant *Benjamin Mooers*, and *Zaccheus Pearslie*, all of the *Canadian* old regiment, jointly, all his landed interest, in *Moore* town, at *Coos*, on the *Connecticut* river, and, also, all his lands and tenements in the barony of *Longville*, in *Canada*." The plaintiff and defendant were witnesses to this will, and, therefore, the devise to them was void; but, he afterwards made a codicil, duly executed before other witnesses, one of whom was *Alexander Hamilton*, and by that codicil he "approved, ratified, and confirmed the former last will and

testament, except so far as the same was thereby altered;" and he declared the codicil " to be part and parcel of his last will and testament within written." This codicil was endorsed and written on the back of the original will, and I see no reason why the codicil, executed with all the solemnities required by the statute, was not a republication of the will, so as to give effect to the devise to the parties to this suit, equally, as if they had been expressly mentioned in the codicil. (*Acherly* v. *Vernon*, *Comyn's Rep*. 381. 3 *Bro. P. C.* 85. *Barnes* v. *Crowe*, 1 *Vesey*, jr. 486. 4 *Bro.* 2. *Piggott* v. *Waller*, 7 *Vesey*, 98.) The value of this devise to the plaintiff does not appear ; but if the plaintiff was to be entitled to recover, it would be just to marshal the real assets upon principles of equity, and require him to render an account of the devise to him, so that he might bear, at least, a rateable proportion of the demand, and not leave the whole to fall upon that portion of the real estate which was devised to *W. H.*, and afterwards escheated to the state.

To give effect to the acknowledgment of the executor, as against the heir, and thereby to defeat the application of the statute of limitations, it is again contended, that the executor can, at his pleasure, and at any time, not only confess the debt as against the personal estate in his hands to be administered, but give to the creditor the complete benefit and execution of his secret lien upon the real estate, by causing it to be sold, and the proceeds applied to the payment of the debt. If he can control the real estate in this way, in despite of the heir, why should not his confession of the debt, it may be said, be equally binding upon the heir ? It would appear to me to be a sufficient answer to this objection, that the executor has not, in fact, in this case, made the requisite application, or obtained any order to sell the real estate to pay the plaintiff ; and, until that has been done, his power over the real estate does not exist, and his acknowledgment of the debt is a nullity, as

*1822.*

MOOERS
v.
WHITE.

A codicil, with three competent witnesses, may be a republication of a will, so as to give effect to a devise, otherwise void, on account of the devisee being a witness to the original will.

1822.

MOOERS
v.
WHITE.

An executor or administrator cannot, at *any time* he may think fit, apply to a Surrogate, under the statute, for a sale of the real estate of the testator or intestate, for want of sufficient personal assets; but must make the application within a reasonable time.

against the heir or devisee, or a purchaser under either. But I am not prepared to admit, that the executor or administrator can, at any time, and in his discretion, apply for, and be *entitled* to an order for the sale of the real estate ; and I am of opinion, that whatever may be the merits of the present demand, the defendant, as executor, is now too late to apply for a sale of the real estate, and that his capacity for that purpose is entirely extinguished. This point has a very considerable bearing on the discussions in this case, and I have thought it might be useful to bestow upon it a few moments' attention.

The statute (1 *N. R. L.* 450—453.) declares, that the executor or administrator, when he shall discover or suspect that the personal estate is insufficient to pay the debts, shall, " as soon as conveniently may be," make a just and true account of the personal estate and debts, and, after filing an inventory, and fully applying the personal estate to the discharge of the debts, he shall deliver such account to the Judge of Probates, or Surrogate of the county, and request his aid in the premises. The Judge is then to make an order, directing, by a due public notice, " all persons, interested in the estate," to appear and show cause, why so much of the real estate, whereof the testator or intestate died seised, should not be sold, as will be sufficient to pay the debts. He is then, at the time and place appointed, to " hear and examine the allegations and proofs of the executor or administrator, and of all other persons interested in the estate," who may make or offer any. If the heir or devisee be an infant, the Judge or Surrogate is to appoint a guardian, for the sole purpose of taking care of the interest of the infant in such proceedings. And if, " upon due examination," he shall find the personal estate not sufficient to pay the debts, he shall direct the whole or a part of the real estate to be sold. The sales, under the order, are to be made by the executor or administrator, for cash, or upon credit, and on such terms as he shall deem

best; and he, together with such other discreet person as
the Judge or Surrogate may appoint, are to execute the
conveyances, which, the statute says, shall be valid against
the heirs and devisees, " and all claiming by, from, or
under them." If only part of the real estate be sold, the
moneys arising therefrom shall be received by the execu-
tor or administrator, " and shall be considered assets for
the payment of debts." But if the whole of the real
estate be sold, the moneys are to be deposited with the
Judge of Probates, or Surrogate, and to be by them dis-
tributed among the creditors in just proportions.

This is the substance of the provisions of the act upon
the subject, and I infer from them, that the law intended,
that the executor, or administrator, should make his appli-
cation with due diligence, and in a reasonable time ; and, if
he does not, the Judge or Surrogate has, from the nature
of his judicial trust, a discretion to reject the application.
What is reasonable time, may be another question. All I
mean, at present, to say, is, that the Judge of Probates, or
Surrogate, must be entitled to determine, in sound discre-
tion, what is a reasonable time, under the circumstances of
the case, and to determine when the executor did first dis-
cover, or had ground to suspect, the insufficiency of the
personal estate, and whether, *as soon as conveniently might
have been*, he had made out an account, and filed an inven-
tory, and applied the assets in hand according to the re-
quisitions of the statute. If he has been guilty of gross
negligence, or palpable *laches* on these points, he is clearly
not in season within the meaning of the act, and the Judge
or Surrogate ought not to permit him, or the creditor who
prompts him, by this summary proceeding, to sweep away
the real estate of the heir.

And what is
a reasonable
time, must be
determined by
the Surrogate,
in his sound
discretion, un-
der the cir-
cumstances of
the case.

Other provisions in the law, show the like necessity of
diligence in the settlement of the estate of the testator or
intestate. The executor and administrator are required to
file their inventory within six months after they have as-

1822.

MOOERS
v.
WHITE.

*It seems, that one year, after the executor has entered on the duty of his office, is a reasonable time, within which to apply to the Surrogate, in ordinary cases.*

sumed their trust; and, after the expiration of one year, and not before, they may be called upon to pay legacies, and make distribution among the next of kin. (1 *N. R. L.* 311. 316.) The law presumes, that, by that time, they have ascertained the amount of the debts, and of the assets, and have made due provision for the creditors, and are in a condition to distribute the surplus. The legatee and the next of kin are then entitled to sue; and, perhaps, it would not be going too far, to say, that, under the sound construction of the statute, and the pressing diligence which the provisions I have referred to, evidently inculcate, the executor or administrator ought to be ready to apply, and ought to make his application, within one year after he has entered upon the trust; and that every subsequent application, unless under peculiar circumstances, and with some reasonable cause for delay, may, consistently with sound discretion, and the spirit and policy of the act, be adjudged out of season, and rejected.

Such a rule of construction is most beneficial to the public, since it conduces to the quiet and security of titles, and to the protection of the *bona fide* purchaser, holding under the heir or devisee. Public policy requires, that a power of such formidable import, and which affects the *bona fide* purchaser equally with the heir and devisee, should be strictly construed. Nor will the creditor, for whose benefit the whole provision is intended, be materially affected. He has still his remedy upon his bond or simple contract, by action at law, against the heir or devisee, and can make them answer for the value of the assets, descended or devised. The creditor is not here pressed by time, as the executor or administrator, acting on his behalf, is in the other case, because, this is not a newly created and summary power, but the ordinary course of the common law. He cannot, indeed, touch the real estate, *bona fide* aliened before suit brought, but he can make the heir or devisee answerable for the value of the lands aliened,

and a judgment against the executor or administrator, is no bar to a subsequent suit against the heir or devisee, for the same matter. They shall be liable, in like manner, as if no such judgment had been obtained; and so, also, a judgment against the heir or devisee, is no bar to a subsequent suit against the executor or administrator, and such action may, also, be maintained and prosecuted, in like manner as if no such judgment had existed. (1 *N. R. L.* 316, 317.) And these provisions serve to show, (if any illustration for that purpose could be necessary,) that the executor and the heir are each entitled to their separate means of defence, and that the confession of the one cannot be the confession of the other.

All the analogous cases in the law show, that these public trusts, created for the benefit of creditors, are to be executed promptly, and that it forms no objection, that the creditor's debt happens not to be due within the reasonable time prescribed for the settlement of the estate. Thus, in the case of trustees, under the *absconding debtor act*, (1 *N. R. L.* 159—162.) they are to give notice of their appointment " as soon as may be," and call upon the creditors to render their accounts; and they are to convert the estate into money, and make distribution among the creditors, " within one year and a half" from the time of their appointment; and they are to make further dividends as assets come to hand. But the creditors are to come in and exhibit their debts, whether they be then due or not; and those who neglect or refuse so to do, by the time of the second dividend, (and which is to be " within one year" from the time of the first dividend,) are to lose their dividends entirely; and, in cases of debts not due, and not on interest, there is to be a rebate of interest from the time of actual payment. So, in the case of assignees under the insolvent debtor act, (1 *N. R. L.* 468—470.) they are required to make a dividend among the creditors "within the space of one year;" and if any creditor shall neglect

1822.

MOOERS
v.
WHITE.

or refuse to prove his debt, " within one year and a half" after the assignment and division of the estate, he shall lose his dividend, or take his chance under a second dividend, to be made " within one year thereafter ;" and if he shall not prove his debt then, he shall be for ever barred. If the debt be not due at the time of the dividend, the creditor is, notwithstanding, to take his dividend under a rebate of interest, if the debt be not payable with interest. The same rule prevailed under the late bankrupt act of the *United States ;* and the assignees were to make their first and second dividends within twelve and eighteen months from the time of the commission, and the second dividend was to be final upon all creditors who had not come in and proved. If the debt was not due, still it was to be proved, and the creditor paid rateably with the other creditors, subject to the usual discount, where no interest was payable.

That the debts are not yet due, is no objection to an application to the Surrogate, for a sale of the real estate, if the personal estate is not sufficient to meet the debts.

The circumstance of the debt not being due, forms, then, no obstacle to the application to the Surrogate, when the executor has not personal assets sufficient to meet it. In these cases, where the estate is to be appropriated under the directions of a trustee specially created by statute, the creditor, whose debt is not due, is bound to take it equally as the other creditors whose debts are due, or waive the benefit of the provision. And can one reasonably suppose that the executor may apply, at any distance of time, and that there is any just analogy between this right of application on behalf of the creditor, and the right of entry upon land by a person claiming title, and which, by our statute, is limited to twenty years ? The real estate of a testator or intestate, is no doubt chargeable with the payment of his debts, and so far even the simple contract creditor may be said to have a lien on the real estate. But that lien existed without and before this statute provision, and it was to be enforced by a suit, in the regular course of justice, against the heir or devisee. They may, indeed, convey to a *bona fide* purchaser without notice before suit brought,

and in that way defeat this latent and unregistered lien, as against the land itself, and so might the debtor have conveyed the estate, in his lifetime, and defeated it. It can hardly be intended, that the law meant that the lien should be better against the heir who succeeds by title, than against the ancestor who created the debt. In the case of the special provision now under review, the lien is increased, because, if the executor applies on behalf of the debtor, to the Surrogate, and the land be sold, it avoids all mesne conveyances since the death of the testator; and for that very reason, as well as for other cogent considerations, the right of application ought to be strictly construed. It appears to me to be impossible to suppose, that upon any just construction, we are to extend the time to the period of the limitation of the right of entry in a possessory action, or that the direction, that he should apply " as soon as conveniently may be," means twenty years.

There is difficulty, no doubt, in fixing upon any precise period within which the executor is to apply, when the statute has not expressly mentioned any. I have suggested, as an opinion, to which I am at present inclined, without the benefit of a more direct and full discussion by counsel, that one year would, in ordinary cases, be a reasonable time; and that if the executor or administrator waits longer, he ought to be able to satisfy the Judge or Surrogate that he had sufficient cause. Even under this limitation the power is dangerous, if not oppressive, to the owner of the real estate, because it deprives him of the opportunity of submitting to a jury his objections to the demand, and the facts tending to show that it is not a valid and subsisting debt. In every case, in which application to the Surrogate is made and sustained, the objection to the debt, whatever that objection may be, whether founded upon the statute of limitations, the lapse of time, payment, release, usury, fraud, &c. must be left to the judgment of the Surrogate, who alone is to determine what

is a subsisting debt within the meaning of the act. If the application could be made at any distance of time short of the limitation in a writ of entry, it is scarcely possible to conceive all the mischievous consequences of such an enormous power in the executor or administrator over the real estate. The extent of real property that must, in the course of 20 years, be transmitted by descent or devise, is immense ; and the number of persons through whom that property passes, by mesne conveyances, is inconceivable. Can it be possible that a latent lien, of which no vestige is upon record, and founded upon some stale account, known to no person, is to be put in operation, at any time, at the will and pleasure of the personal representative, without any means allowed to the *bona fide* purchaser, to meet and litigate the claim before the common law tribunals of the country ?

These are some of the reasons why I am induced to think that the Judge of Probates, or Surrogate, is bound *to exercise a judicial discretion* in the case, and to require the executor or administrator to satisfy him that he has used his best diligence to ascertain the debts and the assets, and that he applies for relief as soon as he conveniently could. I am clearly of opinion, that *White*, the executor in the present case, is not now, at this late day, authorized to apply to have the real estate of *Hazen* sold, and that he had entirely waived the opportunity, even in 1813, when he wrote the letters which are supposed to contain the acknowledgment of the debt. The plaintiff, therefore, cannot be permitted to give any collateral aid to that acknowledgment, from the circumstance that the executor had originally a capacity to apply to the Surrogate, and to compel the heir or devisee, or purchaser, *nolens volens*, to satisfy the creditor out of his real estate, for the executor had long since lost that capacity, by his unreasonable delay.

As the interpretation of the power depends much upon

the particular language of the statute, we cannot expect to be entirely guided in our opinion by foreign decisions. But the statute of *Massachusetts* is so very similar in its provisions, that the doctrine of their Supreme Court in the case is very important, and sheds much strong light on the subject.

By the statute of that state, the real estate of the testator, or intestate, is made chargeable with the debts of the deceased, and liable to be taken on execution, and extended and delivered to the creditor, on a judgment recovered against the executor or administrator. And again, when the personal estate shall be insufficient to pay the debts and legacies, so much of the real estate may be sold by the executor or administrator, on obtaining license from the Supreme Court, or the Court of Common Pleas of the county, as shall be requisite to satisfy the creditors.

In the case of *Gore v. Brazier*, (3 *Mass. Rep.* 523.) the creditor recovered judgment, four years after the testator's death, against the executor, and not finding sufficient personal estate of the testator, he levied on land devised and sold, and in the possession of the purchaser. It was held, that an alienation by, or descent from the heir or devisee, did not discharge the lands from the creditor's lien; and the Court said, that the lien would continue a reasonable time, and until defeated by the neglect or laches of the creditor; and they intimated, though without forming an opinion, that a delay of 20 years would liberate the lands.

That case was analogous to our actions at law against the heir and devisee, and which, with us, can only be barred by the statute of limitations in the case of simple contract debts, and by the presumption of payment, founded on the lapse of time, in the case of a specialty, and we only make the heir or devisee answerable, and not the *bona fide* purchaser. The case, therefore, is not applicable to the point now under consideration. The same thing may

1822.

MOOERS
v.
WHITE.

be said of the cases of *Wyman* v. *Brigden*, and *Drinkwater* v. *Drinkwater*, (4 *Mass. Rep.* 150. 354.) in which the question of the permanency of the creditor's lien arose. But in the latter case, the Ch. J. observed, that the administrator had no interest in the lands, but a naked authority to sell them on license, to pay debts when the personal estate was insufficient, and that he might sell on license, whether the lands were in possession of the heir or his alienee. The right to sell being a naked power, could not be defeated by alienation or disseisin. The same point was decided in *Willard* v. *Nason*, (5 *Mass. Rep.* 240.) But the case of *Hays* v. *Jackson*, (6 *Mass. Rep.* 149.) approaches much nearer to the question before me. The executor applied to the Supreme Court for license to sell real estate to pay debts and legacies. The heirs appeared upon notice, and sundry questions were discussed. The Court held, that they had power, under this application, to marshal the real assets upon principles of equity, by directing the order in which the different parts of the real estate were to be sold.

None of these cases, however, touch directly the point we are considering. But *Scott* v. *Hancock*, (13 *Mass. Rep.* 162.) may be cited as an authority upon the question before me, and the discussion it contains is very able, and the principles which are there laid down extremely important.

The Supreme Court refused to grant a license to an administrator to sell the real estate. It appeared that the only debt due from the intestate was secured by a mortgage, and that the mortgagee was in possession, and had never demanded the debt, and that more than four years had elapsed since the granting of administration.

The opinion of the Court was delivered by Mr. J. *Jackson*, and it was admitted, that the claim of the creditor was paramount to every title that could be acquired after the death of the debtor. If that claim or lien was as un-

limited in its duration as in its extent, it would nearly destroy all security in any title to real estate. It was observed, that there was one, limitation of this right of the creditor, which arises out of the nature of the remedy. The only mode in which he could resort directly to the land was, by obtaining a judgment against the executor, and, of course, whatever, would defeat such an action would destroy the lien. The executor, or administrator, may, therefore, protect the land in the hands of the heir, by pleading the statute of limitations when applicable to the case. But, (continues the learned Judge,) it has been settled, that an administrator is not bound to plead the statute. The land might, therefore, still be bound for an indefinite period, at the will of the administrator. He might capriciously permit one creditor to recover, and prevent another, whose claims were equally just; and he might, by collusion with a creditor, enable him to recover a demand, when, perhaps, if it had been seasonably presented, the heir, or others interested, might have furnished evidence of its discharge.

The statutes of 1788, and 1791, enacted, that no administrator should be held to answer to any suit, unless commenced within four years after undertaking the trust, and due notice thereof. The general effect of this statute is to discharge the lien on the estate after the expiration of four years.

But if the administrator should neglect to do his duty, and plead the statute of limitations, " we need not" says he, " now consider what would be the effect of a judgment against him in a suit commenced after the expiration of the four years, *nor, how far it would conclude the heir*, and expose the real estate in his hands to be taken in satisfaction of such judgment. The Court, would, probably, in such a case, *not interfere in any manner that might prejudice the heir*, and would leave the judgment creditor to seek his remedy against the administrator, or heir, as he

should be advised, *and not order a sale of the land, if ob-jected to by the heir.* If the administrator should have acknowledged the debt, and so prevented himself from successfully pleading the statute, the heir, out of whose estate the money is to come, if lawfully recovered, has a right to deny the fact of the acknowledgment, and to submit it to a jury. *The heir may also dispute its legal effect and operation."*

These are questions, it was observed, which affect the inheritance. If the Court should order a sale, it would decide these questions conclusively against the heir, and disinherit him, without an opportunity of defending himself by a trial of the facts by a jury.

The Court has a discretionary power in the case; and to permit an administrator to preclude the heir from making a defence, would violate that maxim of law, which says, "that it shall not be in the power of any man, by his election, to vary the rights of two other contending parties."

I have repeated the substance of the able argument which was delivered by the Court, because it appears to be applicable to the case before me, and to go very far towards deciding some of the points which have been discussed. It may be inferred, as the doctrine of that case, that the executor is not to be permitted, either by his acknowledgment of the debt, or by availing himself of the power of application for the sale of the real estate, to deprive the heir, or those holding under him, from availing themselves of the defence of the statute of limitations. The same principles were advanced in the subsequent case, *ex parte Allen,* (15 *Mass. Rep.* 58.) in the opinion delivered by Chief Justice *Parker.* It was held, that the Court had a discretion on the subject of granting a license to the executor to sell the real estate, and that a purchaser under the heir, ought not to be disturbed at the will of the executor, after the time had elapsed when by law the executor had a right to prevent the creditor's recovery. If the Court

had not the power to refuse a license to sell, the executor might, at any time, by collusion with the creditor, or by negligence, permit a recovery, the effect of which would be to defeat vested rights, and the beneficial effects of the statute of limitations. It was, accordingly, held, that the executor could not, after the expiration of four years, (being the period of limitation of suits against the executor and administrator,) obtain a license to sell, even though debts should remain unpaid. That remedy was held to be lost, by the negligence of the creditor.

According to this case, then, the executor ought not, in any case, to be permitted to obtain an order for the sale of the real estate, as to debts which would be barred at that time by a plea of the statute of limitations ; and the reason is, that the heir, or other owner of the real estate, is entitled to the benefit of that plea, and this order would be the means to deprive them of it.

If I am not greatly mistaken, this last decision, in *Massachusetts*, is decisive in favour of the defence set up by the Attorney General in the present case.

The subject before us underwent much discussion in the Supreme Court of the *United States*, in the case of *Ricard* v. *Williams*, (7 *Wheaton*, 60.) The question arose under a sale, by order of the Court of Probates of *Connecticut*, upon the application of the administrator, under a statute provision similar in substance with that in *Massachusetts*. In that case, the administrator applied for and obtained the order, three years after he had assumed the trust ; and the validity of the order was not questioned, because it was the order of a competent Court, of peculiar and exclusive jurisdiction. It was an extraordinary and a monstrous case. Letters of administration were granted after the lapse of 28 years, and the right to sell after the lapse of 31 years, from the death of the intestate ; yet the decree of the Court, being *res judicata*, could not be questioned in a collateral action. The point was very fully

1822.

MOOERS
v.
WHITE.

discussed at the bar and by the Court, respecting the limitation of time that ought to be imposed upon the exercise of a power in the executor or administrator, to apply for an order for the sale of the real estate. It was conceded, that the power ought to be exercised within a reasonable time, or it was to be deemed waived and extinguished. Mr. Justice *Story*, who delivered the opinion of the Court, after describing with great force, and with just colouring, the incalculable mischiefs, and the intolerable injustice of suffering such a secret lien to be called into action, at any distance of time, concludes, that it ought to be limited by analogy to the limitation of the right of entry in real actions, and which, in *Connecticut*, is fifteen years. With the utmost deference, I would beg leave to observe, that the powerful argument which the learned Judge delivered on this point, ought to have led the Court to a more vigorous conclusion. I am much better pleased with the results of the discussion, contained in the two last cases, cited from the *Massachusetts Reports;* and I think it cannot be admitted, that the executor or administrator has it in his power, at any time within 20 years, (for that is our period to the right of entry,) and upon any account, or upon any contract, whether sealed, or written, or verbal, to awaken this hidden and tremendous lien, which is to bear down all rights and titles that stand in its way. The analogy does not hold between the right of a creditor to charge his debt upon the land of his debtor, and the right of entry upon land under a claim of title. Every creditor has that right over every debtor, and yet he must sue him upon his simple contract within six years. The right to sue and charge is one thing, and the right of entry upon land is another, and a graver right. Even judgment liens of record cease with us, by statute, after ten years. It is impossible, then, that this indirect and latent lien can be admitted to stand a comparison with the solemnity and efficacy of the right of entry.

If, however, we were to admit that the defendant, *W.*, was still in time to apply for the sale of the real estate, yet, I apprehend, that when the persons interested in the real estate appear before the Judge or Surrogate, with their allegations and proofs, they are entitled to raise the same objections to the creditor's demand, which they might have used, if they had been regularly sued; and that they may, of course, interpose the statute of limitations. The justice and reasonableness of this proposition, are so exceedingly clear, that I cannot regard it as susceptible of doubt. The Surrogate must be satisfied of the existence of the debts beyond the amount of the personal estate, before he can grant the order for the sale of the real estate. He must adjudge what are *debts*, and the statute must mean *subsisting* debts; if they are barred by the statute, and that be set up as a defence, the conclusion is, that they have been paid, and that they do not then subsist. If the heir or purchaser appears, and makes this defence, it is *his defence*; and the executor has no right to interfere, and disturb or waive it. The doctrine in the analogous case of bankruptcy, is very much in point. It was held, in the case *ex parte Dewdney*, (15 *Vesey*, 479.) that a debt could not be admitted under a commission of bankruptcy, which could not be recovered in an action at law, or in equity, against a plea of the statute of limitations; and that any creditor had a right to raise the objection.

I conclude, accordingly, and with the most entire conviction of the solidity of the defence which has been made, that the main purpose of the suit has failed. The bill, as against the fund in Court belonging to the people of this state, ought to be dismissed.

The executor, in his answer, also sets up the statute of limitations in bar of the account. His letters of *March*, and *August*, and *October*, 1813, do, however, go very far towards an admission of the right of the plaintiff to a settlement of accounts. In the letter of *March* 20, 1813, he

1822.

MOORE v. WHITE.

The heirs or persons interested in the real estate, may appear before the Surrogate, and oppose the application of the executor for a sale, and may interpose the statute of limitations, in the same manner as if they were sued by the creditor. For it must be shown, that there are valid and subsisting debts beyond the amount of the personal estate, that is, debts not barred by the statute, before an order of sale is granted.

admits the agency of the plaintiff for the testator, in his life-time, in respect to certain lands ; and in his letter of the 27th of *August*, 1813, he states, that he had called three times upon the plaintiff for a settlement, and that at their last interview it was agreed that the plaintiff should make out a statement of his account, Dr. and Cr. ; and in his letter of *October* 25, 1813, he wishes the plaintiff to send him his account for examination. These requests resemble very much the admissions quoted by Lord *Mansfield*, in *Cowp.* 548. as, " prove your debt and I will pay you." " I am ready to account, but nothing is due to you."

The bill also contains a charge of services rendered to the defendant, *White*, in his character of executor ; and the defendant did not think proper to complain of such multifarious demands. I am inclined to permit the plaintiff to take a reference for an account, if he wishes it, against the defendant, *White*, under the express declaration, that this is not to be construed into the admission of any right against the fund in Court, even though a balance should hereafter be found due, and reported in favour of the plaintiff, as against the personal estate of the testator in the hands of the defendant.

The following decree was entered :

" It is declared and adjudged, that lot No. 62, in the pleadings mentioned, was vested in the people of this state, by escheat, upon the death of *W. H.*, and that they became seised of the same upon his death, without office found, and continued so seised until the said lot was, under the authority of this state, duly transferred to the *United States*. And it is further declared and adjudged, that the moneys in Court, being the proceeds of the said lot, belong, also, to the people of this state, subject to the payment of the debts of *M. H.*, provided they be valid and subsisting debts at the time of the filing of the bill. And it is further declared and adjudged, that any admissions of the

defendant, *M. W.*, as executor of the said *M. H.*, in favour of any claim or demand of the plaintiff, cannot prejudice or affect any defence against any such claim or demand, which the people of the state would be entitled to make, without such admission, in respect to the said fund. And it is further declared and adjudged, that the lapse of time, since the balance of the unsettled account, claimed by the plaintiff, arose, and the statute of limitations, which are both insisted on in the answer on behalf of the people, by their Attorney General, as a bar to the claim of the plaintiff, in respect to the said fund, severally constitute a sufficient and valid defence, on the part of the said people. It is, thereupon, ordered, &c., that the bill, as against the defendant, *Samuel A. Talcott*, for satisfaction out of the said fund, be dismissed, without costs. And, inasmuch as it appears that the defendant, *M. W.*, as executor of *M. H.*, has, within six years before the filing of the bill, offered to come to an account with the plaintiff : It is, thereupon, further ordered, &c., that if the plaintiff shall so elect, this cause, as between the plaintiff and the defendant, *M. W.*, as executor aforesaid, be referred to one of the masters of this Court, to take and state an account between the plaintiff and the said *M. W.*, as executor aforesaid, and that he allow such charges and such credits only, on each side, as shall be duly and satisfactorily supported by proof, and without interest on either side, except for moneys actually advanced ; and that he, also, take and state an account of the assets which came to the possession of the said defendant to be administered, and of the administration thereof ; and that he make to the said defendant all just allowances, according to the course and practice of the Court, and examine the parties, and each of them, on oath, touching any part of their accounts, if he shall deem it necessary or proper, and that he allow to the defendant his right of retainer or charge against the assets, in respect to any account or demand of his against the

testator, or the said assets, which shall be duly and satis-factorily supported ; and that he report the amount of the assets, if any, which remain unadministered, after all due dispositions thereof, and charges and allowances as afore-said, shall have been deducted; and that he also report the balance, if any, upon such accounting, that shall re-main due to, or that shall remain due from the plaintiff, as the case may be ; and the testimony taken in chief, is to be submitted to the master, together with such other proper testimony as either party may think proper to furnish.    And it is hereby declared, that no balance, to be reported in favour of the plaintiff, shall be deemed or taken to be of any force or effect, in respect to the said fund in Court, belonging to the people of this state.    And it is further ordered, that the question of costs, as between the plaintiff and the defendant, *M. W.*, and all other questions, be reserved; and that in case the plaintiff shall not, on or before the first day of *December* next, elect to take a reference, upon the terms aforesaid, that then, and in that case, the bill, as to all the defendants, stand dismissed, without costs."